Est. of Michael Katz, Est. of Rose Katz, First National of Kansas City, Mo., and Arthur B. Mag., Exr. v. Commissioner.
Katz v. Commissioner
Docket No. 81183.
United States Tax Court
T.C. Memo 1961-270; 1961 Tax Ct. Memo LEXIS 82; 20 T.C.M. (CCH) 1411; T.C.M. (RIA) 61270; September 28, 1961
*82 Held, gain from the sale of an annuity policy was ordinary income and not capital gain. George E. Gibson, Esq., G. Lee Burns, Esq., 9 W. 10th, Kansas City, Mo., and Ernest M. Fleischer, Esq., for the petitioners. Hugh C. Roberts, Jr., Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined a deficiency in the 1956 income tax liability of the petitioners in the amount of $22,687.64. The sole question for decision is whether the gain from the sale of the annuity policy in question is ordinary income or capital gain. Findings of Fact Some of the facts have been *83 stipulated and are hereby found as stipulated. The petitioners, Michael H. Katz (hereinafter referred to as petitioner) and Rose B. Katz, are husband and wife residing in Kansas City, Missouri. They keep their books and file their income tax returns on a calendar year basis on the cash receipts and disbursements method of accounting. Their joint return for the year 1956 was filed with the district director of internal revenue at Kansas City, Missouri. Petitioner was born on March 6, 1887. At all times material hereto, petitioner has been an officer and director of Katz Drug Company, a corporation engaged in the retail drug business. Petitioner is not, and has never been, a dealer in annuities, life insurance policies, or securities. The Equitable Life Assurance Society of the United States (hereinafter referred to as Equitable) is now, and has been at all times material hereto, a mutual insurance company under the laws of the State of New York. On September 8, 1934, petitioner purchased from Equitable, for a single premium of $50,000, Retirement Annuity Policy No. 9,564,624 (hereinafter referred to as the policy), bearing register date of September 8, 1934, and issue date of *84 September 17, 1934. As permitted by the terms of the policy, petitioner, on September 16, 1948, elected a refund annuity beginning at age 65 and designated his wife and children the beneficiaries who were to receive the net sum due under the policy by reason of his death, and on October 5, 1951, cancelled such annuity election and in lieu thereof elected a refund annuity beginning at age 70, but made no change in the beneficiary provisions. Under the latter election, monthly annuity payments in the amount of $787.84 each would have begun on September 8, 1956, the anniversary of the register date of the contract nearest petitioner's seventieth birthday. Other optional modes of settlement could have been selected at any time prior to the due date of the first monthly annuity payment. The policy provided that at any time after the first contract year, but prior to the due date of the first annuity payment, the policy could be surrendered for its cash surrender value. The following schedule shows the cash surrender value of the policy at the end of the respective years: DEATH BENEFIT IN CASE OF DEATH DURING CONTRACT YEAR CASH SURRENDER VALUE AT END OF CONTRACT YEAR FOR EACH PREMIUM-UNIT *85 [1]
Contract
Cash Surrender
Year
Value or Death Benefit
1
$ 950
2
991
3
1,026
4
1,061
5
1,099
6
1,137
7
1,177
8
1,218
9
1,261
10
1,304
11
1,348
12
1,393
13
1,440
14
1,489
15
1,539
16
1,592
17
1,645
18
1,701
19
1,759
20
1,819
21
1,881
22
1,945
23
2,011
24
2,080
25
2,151
26
2,224
27
2,301
28
2,379
29
2,461
30
2,545
31
2,633
32
2,723
33
2,817
34
2,913
35
3,014
36
3,117
37
3,225
38
3,336
39
3,451
40
3,570
41
3,693
42
3,820
43
3,952
44
4,089
45
4,230
46
4,377
47
4,528
48
4,685
49
4,847
50
5,015
51
5,189
52
5,369
53
5,555
54
5,747
55
5,947
In the case of a mutual insurance company, divisible surplus is the amount of the company's earnings that are left over after the legal reserve is set aside and after the amount which the directors decide should be added to the contingency reserve is also set aside. So determined, the divisible surplus is then apportioned to and divided among the policyholders. The instant policy provided for participation in the divisible surplus of the company. It permitted petitioner to elect to have any surplus *86 apportioned to the policy as a dividend either paid to him in cash or left with Equitable to accumulate at interest. Petitioner elected the latter option. Only two dividends were apportioned to the policy; one in 1935 in the amount of $104.50 and the other in 1936 in the amount of $85.50. Neither dividend was paid to petitioner. The policy was assignable, and each assignee thereof had the same rights as did petitioner, including the right prior to commencement of annuity payments to elect one or more of the optional modes of settlement. In this connection, the policy expressly provided: ASSIGNMENTS. No assignment of this contract shall be binding upon the Society or be deemed to be in force unless in writing and until filed at its Home Office. The Society assumes no responsibility for the validity of any assignment. On August 23, 1956, petitioner assigned and transferred the contract and all rights therein to Mercantile Bank & Trust Co., Kansas City, Missouri, a Missouri corporation engaging in a general commercial banking business, (hereinafter referred to as the bank), in exchange for $97,200 which petitioner deposited in his checking account at the Commerce Trust Company, *87 Kansas City, Missouri. The transfer of the policy was accomplished on a "Form of Absolute Assignment" provided by Equitable. Both the original and an executed duplicate of the assignment were delivered to, and accepted by, Equitable at its Kansas City, Missouri, office on August 23, 1956, and were filed in its home office on August 27, 1956. Equitable recognized the assignment as transferring all of petitioner's right, title, and interest in the contract to the bank. The bank purchased the contract from petitioner as an investment for its own account. The transaction was handled by the bank in the same manner as other investments, such as bonds, single maturity notes and trade acceptances, which it purchased at discounts. The bank surrendered the policy to Equitable for its cash surrender value prior to September 8, 1956, the date on which annuity payments would otherwise have commenced, and received therefor Equitable's check dated September 8, 1956, in the amount of $97,602.01. The sum of $97,602.01 which the bank received was made up of the following items: Cash surrender value, 9-8-56,
22 years
$97,250.00
Policy dividend 1935
104.50
Policy dividend 1936
85.50
Interest on dividends
162.01
$97,602.01
*88 Petitioner realized a gain of $47,200 (sale price of $97,200 less cost of the policy, $50,000) on the sale of the policy to the bank. Petitioner and his wife reported this gain in their joint Federal income tax return for the calendar year 1956 as long-term capital gain. In his notice of deficiency, respondent determined that petitioner and his wife "realized ordinary income in the amount of $47,200.00 from the disposition of a single-premium annuity contract, #9,564,624, from Equitable Life Assurance Society." Opinion It is respondent's contention that the transaction between petitioner and the bank was not a bona fide sale, but a mere collusive sham to circumvent the payment of proper taxes. ; . In the alternative, respondent contends that the consideration received by petitioner was essentially a substitute for what would otherwise have been received as ordinary income. It is petitioner's contention that he sold a capital asset [2] which was held for more than six months and is therefore entitled to report the gain as long-term capital gain. Petitioner argues that *89 (Ct. Cl., 1958) certiorari denied , is distinguishable from the present case because there the Court of Claims found that "the contract's rate of return is fixed" and hence the increase in the value of the contract bore no material resemblance to "the enhancement in value of corporate stock, affected as it is by a myriad of economic factors." In the case before us, petitioner contends that the same conclusion cannot be reached because the record clearly establishes that the company's policyholders were the owners of the company and thus in a position analogous to the stockholders of a business corporation. Petitioner also maintains that the case of , reversed, (C.A. 4, 1960), was correctly decided by the Tax Court. *90 We cannot agree with respondent's contention that the sale of the policy to the bank was a collusive sham. There is no evidence to support such a conclusion. Although we have little doubt that the principal purpose in consummating the transaction was to minimize taxes, a taxpayer has the legal right to decrease the amount of his taxes or altogether avoid them by means which the law permits. ; ; ; . If, upon careful scrutiny, the transaction has real substance and is not a sham, it matters not whether the taxpayer's aim was to avoid taxes, or to regenerate the world. (C.A. 2, 1935). Even if the purchase by the bank was one of accommodation, this would not affect the nature of the transaction. . We agree with petitioner that the policy was a capital asset within the meaning of section 1221, but this is not necessarily dispositive of the case before us. *91 It is a fundamental principle of Federal tax law that ordinary income derived from an income-producing capital asset must be regarded as ordinary income. The assignment of accrued ordinary income must be treated separately from the assignment of the capital asset which produced the income. This is not an exception to the rule that capital assets held for more than six months shall be given capital gains treatment. It is only when a capital asset appreciates in value and is subsequently sold, beyond the six months' period, that the gain realized may be given capital gains treatment. The general rule is that a right to receive ordinary income, produced by a capital asset, is not transmuted into a capital asset by the sale or assignment of the capital asset together with the right to receive ordinary income. See (C.A. 9, 1955); (C.A. 3, 1958); cf. (C.A. 6, 1954), affirming , certiorari denied . We are convinced that the gain realized by petitioner did not result from the appreciation *92 in value of a capital asset, but was due to ordinary income produced by a capital asset. Petitioner contends that the earnings of the company on its investments, the mortality rates and many other factors affected the enhancement in value of the policy. However, the periodic increases in cash surrender value arose irrespective of such factors. To this extent, the annuity policy is analogous to an interest-bearing bond. The increase in cash surrender value of the policy accrues by reason of the passage of time and not by reason of earnings or other factors. In the instant case the gain was essentially the equivalent of interest and is taxable as ordinary income. Harry Roff, 36 T.C. - (August 10, 1961). Petitioner also contends that the policyholders were the owners or stockholders of the company, a situation which he argues is inconsistent with a debtor-creditor relationship. Even assuming this to be true, petitioner is in no better position. The increases in the value of the policy would be equivalent to dividends paid on stock and hence would still be ordinary income. Under petitioner's theory, there is little, if any, difference between his characterization of the situation and *93 a person holding the preferred stock of a corporation which has a fixed dividend rate. Whether viewed as interest or dividends, the gain is still ordinary income and cannot be converted to capital gain by medium of sale. Just as we said in Harry Roff, supra, our decision in , does not require a different conclusion and it is unnecessary to express any view with respect to the Fourth Circuit's opinion reversing the Phillips case. Decision will be entered for the respondent. Footnotes
1. Premium Unit - $1,000.↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property, held by - (A) a taxpayer whose personal efforts created such property, or (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩